***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and argument of the parties. The appealing party has not shown good grounds to receive further evidence or rehear the parties or their representatives. Following its review, the Full Commission affirms the Opinion and Award of the Deputy Commissioner, with certain modifications.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The parties are subject to the N.C. Workers' Compensation Act.
2. An employee-employer relationship existed between the named employee and employer.
3. The carrier liable on the risk is correctly named. *Page 2 
4. The employee's average weekly wage will be determined from an Industrial Commission Form 22 Wage Chart to be provided by the defendants with supporting wage information.
5. The following documents were stipulated into evidence at the hearing:
 (a) Stipulated Exhibit #1 — Pre-Trial Agreement
 (b) Stipulated Exhibit #2 — I.C. Forms; Defendants' Answers to Plaintiff's Discovery; Form 22; Plaintiff's recorded statement; Plaintiff's Answers to Defendants' Discovery; Miscellaneous correspondence; Nurse case manager reports
 (c) Stipulated Exhibit #3 — Plaintiff's Medical Records paginated 1-137
 (d) Stipulated Exhibit #4 — Plaintiff's job description for autobody repair/painter/technician
 (e) Stipulated Exhibit #5 — A job video
 (f) Stipulated Exhibit #6 — Complete copy of Dr. Johnston's medical records on compact disk
 ***********
Based upon the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 45 years old. Plaintiff left school during his eleventh grade year. Plaintiff graduated from a course in electrical training.
2. Plaintiff's employment history consisted of work primarily in the auto body/auto repair field. He has also worked in the fast food industry and in the oil fields of Louisiana. *Page 3 
3. Plaintiff was first employed by Defendant-Employer in 1990. He worked as a warranty technician for about four years then moved over to the auto body department. Plaintiff performed auto body work for Defendant-Employer for approximately 15 years.
4. Plaintiff had a break in his employment from Defendant-Employer's Jacksonville, North Carolina location. Plaintiff relocated to Ohio for a period of one year and was employed with a Saturn dealership where he performed auto body work. Plaintiff returned to Jacksonville, North Carolina, after his year in Ohio.
5. Upon his return to Jacksonville, Plaintiff was hired by MAACO to perform auto body and paint work. He left that job and went to Auto Works performing the same work before being hired back at Defendant-Employer as a warranty technician in approximately 2005. The warranty technician position entailed performing repairs or replacements of seat covers, water leaks, air leaks, windshields, vibrations, window motors, window regulators, glass, trim, and radios. Plaintiff was scheduled to work 8.5 hours per day but it was not unusual for him to work 10-12 hours a day at least twice a week.
6. Plaintiff utilized both of his hands to perform the tasks required of his position. Defendant-Employer provided him with the appropriate tools to perform the tasks. In a normal day, Plaintiff would use grips, pliers, screwdrivers, wrenches, and pry bars to perform his duties. Air tools were also utilized. Plaintiff would have to apply force in order for the air tools to perform the task required of them.
7. Plaintiff's supervisor, Mr. Charles Arnold, affirmed Plaintiff's testimony regarding the type of work he did and the tools required to perform the job and added that Plaintiff would also have used an air chisel and hammer. He also agreed that Plaintiff's work required the repetitive use of his hands and fingers and the frequent use of tools. Mr. Arnold *Page 4 
stated that Plaintiff was one of his best employees and he made the effort to contact him to hire him back upon Plaintiff's return to Jacksonville.
8. Defendants had a videotape made of Plaintiff's position. Plaintiff had the opportunity to view the videotape and his deposition was taken afterwards. According to Plaintiff, the videotape did not accurately portray his job after he returned to Defendant-Employer in 2005, because the person in the video performed the job at a much slower pace, one could not hear the noise from the air tools which reflects the vibration involved and how hard it is to hold the tools, and none of Plaintiff's typical daily tasks were depicted in the video.
9. Plaintiff testified that he experienced some numbness and tingling in his hands while working for Defendant-Employer before he went to Ohio, but he did not think much about it. Plaintiff then experienced problems with his hands when he was in Ohio and was diagnosed with carpal tunnel syndrome there after he went to the hospital worried that his symptoms were from a heart attack. He did not seek further medical treatment for his hands at that time because he was still able to work.
10. Plaintiff testified that his problems continued when he moved back to Jacksonville and even got worse. Plaintiff gave an example of changing a blower motor after returning to work for Defendant-Employer and screwing it down on his finger without realizing it due to numbness. Plaintiff did not seek medical treatment or miss time from work for his hand problems until after he had returned to work for Defendant-Employer.
11. Plaintiff was primarily treated for his bilateral carpal tunnel syndrome by Carolina Sports Medicine. Mr. Dennis O'Neill, physician's assistant with Carolina Sports Medicine, initially evaluated Plaintiff on October 26, 2005. Based on the positive examination results for carpal tunnel syndrome, Plaintiff was scheduled for surgery. *Page 5 
12. Dr. Esposito performed bilateral carpal tunnel releases on Plaintiff on November 3, 2005. Subsequently, Plaintiff began to develop symptoms of complex regional pain syndrome ("CRPS") (formerly known as reflex sympathy dystrophy or "RSD"). Dr. Esposito referred Plaintiff to Dr. Johnston for treatment of this development. The CRPS or RSD was a secondary diagnosis to the carpal tunnel syndrome and release and was causally related to the same.
13. Dr. Johnston, an anesthesiology and pain medicine specialist, first examined Plaintiff on January 4, 2006. He diagnosed Plaintiff as having RSD at that time and developed a treatment plan involving medication and a stellate ganglion block. Plaintiff was noted to respond well to the block. In his evaluation, Dr. Johnston also suspected that Plaintiff may have a cervical disc problem. He had Plaintiff undergo a cervical MRI which revealed disc protrusions at C4/C5 and C5/C6. Plaintiff subsequently underwent a cervical fusion by Dr. Mark Rodger. The cervical fusion was not related to Plaintiff's bilateral carpal tunnel syndrome and subsequent development of complex regional pain syndrome.
14. Dr. Johnston testified that he would defer to Dr. Esposito with respect to causation regarding Plaintiff's carpal tunnel syndrome and RSD. Dr. Johnston testified that he has seen other cases in his practice where a patient developed RSD after carpal tunnel release surgery.
15. Dr. Johnston also referred Plaintiff to Dr. Kenneth Lee, a neurosurgeon, for an evaluation of hand pain and numbness and cervical disc disease. The examination took place on February 8, 2006. Dr. Lee felt that Plaintiff's ongoing symptoms with his hands were coming mostly from his hands, not his neck. He noted that Plaintiff had difficulty with his hand due to decreased strength. Dr. Lee also noted redness and erythema and complaints of burning pain in his hands. Dr. Lee ordered repeat electrical studies which showed residual carpal tunnel *Page 6 
syndrome. Dr. Lee concurred with Dr. Johnston's diagnosis of CRPS. He stated that plaintiff's neck problem may have contributed to the continued numbness in Plaintiff's hands, but not the ongoing pain.
16. On January 23, 2007, Plaintiff was seen by Dr. Edmund Rowland, an orthopedic surgeon with a specialty in hand surgery, for a second opinion evaluation based on a referral from his partner, Dr. Mark Rodger. On examination, Dr. Rowland noted that Plaintiff was sensitive to light touch, but that his hands appeared to have normal color and sensation and no joint contractures. Additionally, Dr. Rowland noted there were no changes in hair or nail growth and no atrophic changes. Dr. Rowland stated that he had been doing carpal tunnel releases for 15 years and had never had an individual develop RSD. Moreover, he testified that he would have performed nerve conduction studies before scheduling and performing surgery on Plaintiff. Dr. Rowland testified that, based on his years of experience as a hand surgeon and based on his findings on physical examination, it was his opinion to a reasonable degree of medical certainty that Plaintiff did not suffer from RSD. He testified that if Plaintiff did have RSD at one point, then it had been recognized early, treated aggressively, and had never progressed to the worse stages.
17. In 2007, Dr. Esposito requested that a Functional Capacity Examination (FCE) be performed. Plaintiff fully participated in the FCE, which took place on April 12, 2007. The FCE results indicated that Plaintiff could return to work at medium duty for eight hours per day, 40 hours per week. On May 23, 2007, Dr. Esposito stated that Plaintiff had reached MMI and issued a thirty percent (30%) permanent partial disability rating to each of Plaintiff's hands.
18. Dr. Esposito opined that Plaintiff's employment as a warranty technician for Defendant-Employer more likely than not caused his carpal tunnel syndrome and placed Plaintiff *Page 7 
at an increased risk of developing carpal tunnel syndrome as compared to the outside population not so employed.
19. At Defendants' request, Plaintiff underwent an Independent Medical Examination with Dr. George Edwards, an orthopedic and hand surgery specialist, on February 13, 2008. Dr. Edwards reviewed all of Plaintiff's past medical records, a job description, and a job video and performed a physical examination with testing. Dr. Edwards opined that Plaintiff had a low level of RSD, rather than a full-blown case, and that it was related to his carpal tunnel syndrome. He did not believe that plaintiff's neck problem caused his hand problems. Dr. Edwards further opined that Plaintiff's employment with Defendant-Employer significantly aggravated his carpal tunnel syndrome and placed him at an increased risk of aggravating carpal tunnel syndrome as compared to the general public. Dr. Edwards opined that Plaintiff had recovered to the point where there were no residual symptoms of carpal tunnel syndrome or RSD. Dr. Edwards issued a four percent (4%) permanent partial disability rating to each of Plaintiff's hands.
20. The testimony of Drs. Esposito, Johnston, and Lee is found to be credible and greater weight is assigned to their opinions.
21. The greater weight of the evidence establishes and the Full Commission finds that Plaintiff's employment with Defendant-Employer placed him at an increased risk of contracting carpal tunnel syndrome as compared to the general public. The Full Commission further finds that Plaintiff contracted carpal tunnel syndrome as a result of his employment with Defendant-Employer. Plaintiff also developed RSD or CRPS in his hands as a result of his carpal tunnel syndrome. Plaintiff's neck problems did not cause Plaintiff's carpal tunnel syndrome or RSD.
22. The Full Commission finds that Plaintiff sustained a 30% permanent partial disability to each hand as a result of his carpal tunnel syndrome and secondary RSD. *Page 8 
23. Due to his carpal tunnel syndrome and RSD, Plaintiff was unable to earn wages between October 25, 2005 and June 17, 2007. Plaintiff returned to work for Defendant-Employer as an estimator in the body shop at wages less than what he was earning at the time he went out of work for his occupational disease. However, Plaintiff has elected to receive permanent partial disability compensation as opposed to temporary partial disability compensation.
24. Based on calculations from the Form 22 in evidence, Plaintiff's average weekly wage is $742.49, yielding a compensation rate of $495.02.
25. Plaintiff paid for a short-term disability policy while employed with Defendant-Employer. Plaintiff received compensation from his short-term disability policy for the days that he missed from work due to his occupational disease. Defendants are not entitled to a credit for the same.
26. Plaintiff filed his initial medical bills for treatment of his hand condition under his health insurance because he believed that with treatment his condition would improve and he would be able to return to work soon. Plaintiff testified that he was under the impression that he would be back at work six weeks after his release surgery and that he was primarily focused on getting better quickly and getting back to work. Plaintiff testified that he reported the problems he was having with his hands to Charles Arnold prior to having the carpal tunnel release surgery. Plaintiff filed a workers' compensation claim for his occupational disease when he became aware that the condition was serious and would not resolve quickly. In his recorded statement, Plaintiff told the adjuster that he asked his boss at one point if he could return to work part-time on light duty and Defendant-Employer said he needed to be 100% before returning to work. *Page 9 
27. The Full Commission finds that plaintiff had a reasonable excuse for not notifying Defendants of his claim in writing within 30 days of the injury. The Full Commission further finds that Defendants were not prejudiced, notwithstanding the delay in reporting.
 ***********
Based on the competent evidence of record, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff contracted the occupational disease of bilateral carpal tunnel syndrome as a result of his employment with Defendant-Employer. N.C. Gen. Stat. § 97-53(13).
2. As a result of his compensable bilateral carpal tunnel syndrome, Plaintiff also suffered from complex regional pain syndrome/reflex sympathy dystrophy. N.C. Gen. Stat. § 97-53(13).
3. As a result of his compensable occupational disease, Plaintiff was unable to earn wages from October 25, 2005 through June 17, 2007, and is therefore entitled to temporary total disability compensation during that period at the rate of $495.02 per week. N.C. Gen. Stat. § 97-29.
4. Plaintiff is entitled to all medical expenses incurred or to be incurred as a result of his compensable bilateral carpal tunnel syndrome and resultant complex regional pain syndrome/reflex sympathy dystrophy, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-2(19), 97-25.
6. As a result of his compensable bilateral carpal tunnel syndrome, Plaintiff sustained a thirty percent (30%) permanent partial disability to each of his hands. N.C. Gen. Stat. § 97-31. *Page 10 
7. Plaintiff's average weekly wage is $742.49, yielding a compensation rate of $495.02.
8. Plaintiff's claim is not time-barred under N.C. Gen. Stat. § 97-22.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to attorney fees awarded herein, Defendants shall pay to Plaintiff temporary total disability compensation at the rate of $495.02 per week from October 25, 2005 through June 17, 2007. Said compensation has accrued and shall be paid in one lump sum.
2. Subject to attorney fees awarded herein, Defendants shall pay permanent partial disability compensation to the Plaintiff for thirty percent (30%) permanent partial disability to each of his hands at the rate of $495.02 per week.
3. Defendants shall pay all related medical expenses incurred or to be incurred by plaintiff as the result of her injury by accident, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability. Dr. Esposito shall serve as Plaintiff's authorized treating physician for his bilateral carpal tunnel syndrome.
4. A reasonable attorney's fee of twenty-five percent (25%) of compensation awarded to Plaintiff under Paragraphs 1 and 2 of this Award is approved for Plaintiff's counsel. The attorney's fee on accrued compensation shall be paid in a lump sum. Thereafter, Plaintiff's counsel shall receive every fourth weekly compensation check, unless Plaintiff's permanent partial disability compensation is also paid in a lump sum. *Page 11 
5. Defendants shall pay the costs.
This the __ day of February 2009.
 S/___________________ PAMELA T. YOUNG CHAIR
CONCURRING:
 S/___________________ BERNADINE S. BALANCE COMMISSIONER
 S/___________________ DANNY L. McDONALD COMMISSIONER *Page 1